1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT FOR THE

8                        EASTERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| JESSICA HARTUNG, ) | 1:08-cv-00960 AWI GSA |
| ) | |
| ) | FINDINGS AND RECOMMENDATIONS |
| Plaintiff, ) | REGARDING AMENDED MOTION |
| ) | FOR DEFAULT JUDGMENT |
| ) | |
| vs. ) | (Document 72) |
| ) | |
| ) | |
| J.D. BYRIDER, INC., JD BYRIDER ) | |
| OF CHANDLER; CARNOW ) | |
| ACCEPTANCE COMPANY; JOHN ) | |
| ANDERSON; and T-MOBILE USA ) | |
| INC and DOES 1 through 10 inclusive, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____) | |

19

20          Plaintiff Jessica Hartung ("Plaintiff") filed the instant Amended Motion for Default

21  Judgment against Defendant John Anderson, aka, John Edens, on March 24, 2009.  No opposition to

22  the motion was filed.  A damages hearing was held on May 15, 2009.  Plaintiff's counsel Jeremy S.

23  Golden appeared telephonically on behalf of Plaintiff.  Plaintiff also personally appeared. Plaintiff's

24  counsel subsequently filed a declaration on May 20, 2009, as well as a supplemental brief on May

25  23, 2009.   Having considered all of the pleadings and the evidence in this case, the Court

26  recommends that Plaintiff's Motion for Default Judgment be GRANTED IN PART.

27  / / /

28                                          1

**<u>BACKGROUND</u>**

On March 11, 2008, Plaintiff filed a complaint in the United States District Court, Northern District of California against Defendants J.D. Byrider, Inc., JD Byrider of Chandler, Carnow Acceptance Company, John Anderson, T-Mobile USA, Inc., and Does 1 through 10.[1]  The Complaint alleges violations of the Fair Debt Collection Practices Act 15 U.S.C. § 1692, et seq. (Hereinafter, "FDCPA") (first cause of action), California's Rosenthal Fair Debt Collect Practices Act, Cal. Civ. Code § 1788 et seq (Hereinafter, "Rosenthal Act") (the second cause of action), negligence (third and forth causes of action), and invasion of privacy (fifth cause of action).

According to the complaint, Plaintiff purchased a used car from J.D. Byrider and obtained financing from CNAC.  She fell behind on her payments in October 2007.  J.D. Byrider and CNAC allegedly assigned her debt to Defendant Anderson for collection.  On or about January 14, 2008, Anderson allegedly contacted T-Mobile and identified himself as Plaintiff's father requesting that T-Mobile add him as a user on Plaintiff's T-Mobile account.  Thereafter, Defendant allegedly used information obtained from T-Mobile including Plaintiff's home address to begin unlawful and harassing collection attempts by frequently calling and text messaging Plaintiff.

Specifically, the complaint alleges that on January 16, 2008, through January 22, 2008, Anderson began calling Plaintiff in an attempt to collect the debt.  On more than one occasion, Anderson called and/or sent text messages to Plaintiff several times a day in a harassing manner.  Plaintiff told Anderson to cease and desist several times.  Over the course of these five days, Defendant allegedly sent Plaintiff a total of 17 messages in which he was extremely angry, menacing, and intimidating.  These messages included the following:

---

[1] In July 2008, the parties stipulated to dismiss defendant Grace Auto, Inc, which was erroneously sued and served as J.D. Byrider of Chandler  (Doc. 30).  On September 9, 2008, Defendants Byrider Franchising, Inc. (erroneously sued and served as J.D. Byrider, Inc.) and Grace Finance, Inc. d/b/a CNAC (erroneously sued and served as Carnow Acceptance Company) filed a motion to stay the proceedings and compel arbitration.  On October 17, 2008, this court issued Findings and Recommendations recommending that the motion to compel arbitration and the motion to stay the proceedings be granted as to these defendants. These Findings and Recommendations were adopted by Chief Judge Anthony W. Ishii on December 17, 2008.  T-Mobile USA was dismissed from this case on December 9, 2008 pursuant to a settlement agreement (Docs. 45 and 60).

1      1) On January 16, 2008, Anderson falsely stated he was an attorney hired by the Defendant

2 CNAC and claimed that he was hired to "smooth out" issues between Defendant CNAC and

3 Plaintiff;

4      2) On January 17, 2008, Anderson called Plaintiff and stated that he knew her T-MOBILE

5 bill was being sent to her address in Modesto;

6      3) On January 17, 2008, Plaintiff told Anderson to cease and desist communication and

7 ended the conversation;

8      4) After Plaintiff told Anderson to cease and desist communication he called her back

9 continuously.  Plaintiff instructed Anderson to cease, each time to no avail;

10      5) Anderson falsely stated that he would have Plaintiff arrested if she did not let him have the

11 car;

12      6) On January 17, 2008, Anderson sent the following text message to Plaintiff : "Turn the car

13 in or I [sic] send the Sheriff, you [sic] illegally took the car out of state I cant [sic] verify insurance

14 or address." Received 11:15 am, sender 5000-John;

15      7) On January 17, 2008, Anderson sent the following text message to Plaintiff: "[Y]ou have

16 various bills going to crows landing.  I can tell by talking to you you're smarter than this.  So [sic] I

17 guess we'll see."  Received 11:19 am, sender 5000-John;

18      8) On January 17, 2008, Anderson sent the following test message to Plaintiff: "you [sic]

19 might want to tell your amigo Rudy to get a job, I just faxed maricopa [sic] paperwork to stanislaus

20 sheriff department [sic]."  Received 11:35 am, sender 5000-John;

21      9) On January 17, 2008, Anderson sent the following text message to Plaintiff: "I want o

22 make thsi [sic] clear, your money is not what I want.  I want the car.  If you don't give it up, get

23 yourself some bail money." Received 11:37 am , sender 5000-John;

24      10) After Plaintiff received this text message she was in great fear and told the caller to stop

25 calling.  She then called the police;

26      11) On January 17, 2008, Anderson sent the following text message to Plaintiff: "Calling

27 [sic] me will not help you.  Park the car [sic] tell Rudy to warm up the Impala."  Received 11:39 am,

28
                             3

sender 5000-John;

12) On January 17, 2008, Anderson sent the following text message to Plaintiff: "[I]t upsets me a smart girl like you is iwith [sic] a guy is [sic] doing nothing at 11:30 a.m. but when he doesn't have a free car he'll leave."  Received 11:43 am sender 5000-John;

13) On January 17, 2008, Anderson sent the following text message to Plaintiff: "[M]ake sure and have the [sic] deputy call me, nad [sic] show him your DL too."  Received 12:03 p.m. sender 5000;

14) After Plaintiff received this text message the deputy sheriff arrived at her house.  The deputy sheriff called Anderson leaving a voice mail message ordering Anderson to stop contacting Plaintiff;

15) On or about January 17, 2008, Plaintiff called CNAC and spoke to Rose and explained that she felt harassed and intimidated and requested that Anderson cease and desist;

16) On January 18, 2008, Anderson called Plaintiff four times.  In three of those conversations, Plaintiff instructed Anderson to cease and desist and stated that she would have to call the police again;

17) On January 18, 2008, Anderson sent the following text message to Plaintiff: "[D]oes mr. bogens[sic] know you have no DL, no insurance, and no registartion [sic] yet your [sic] on the road doing work."  Received 1:38 p.m. sender 5000-John;

18) On January 18, 2008, Anderson placed an unanswered call to Lawrence Borgens, Plaintiff's employer;

19) On January 19, 2008, Anderson sent the following text message to Plaintiff : "Lawrence Borgens will see me first thing Monday, you should not have been rude to my employee."  Received 12:25 pm, sender 5000-R&J Recovery;

20) On January 19, 2008, Anderson sent the following text message to Plaintiff: "[W]hat makes you think you can drive a car you don't pay for?  My company tows for the local police and sheriff both."  Received 12:27 pm, sender 5000-R&J Recovery;

21) On January 19, 2008, Anderson sent the following text message to Plaintiff:

4

1  "[A]pparently you think you're above the law.  I don't wnt[sic] any trouble. [W]e're just doing our

2  job." Received 12:29 pm, sender 5000-R&J Recovery;

3       22) On January 19, 2008, Anderson sent the following text message to Plaintiff: "[T]he guy

4  in [G]eorgia has been removed from the case.  Now its my entire staff versus you."  Received 12:32

5  pm, Sender 5000-R&J Recovery;

6       23) On January 19, 2008, Anderson sent the following text message to Plaintiff: "[T]hat lady

7  you were rude to means a lot to me I think an apology is in order."  Received 12:33 pm, Sender-R &

8  J Recovery;

9       24) On January 19, 2008, Plaintiff spoke to an employee at R & J Recovery and he indicated

10  that they had not sent any text messages to the Plaintiff;

11       25) On January 20, 2008, Anderson sent the following text message to Plaintiff: "[I]'m

12  hoping to God you see the light and figure out I will just take your car."  Received 5:49 pm, Sender

13  5000- R & J Recovery;

14       26) On January 20, 2008, Anderson sent the following message to Plaintiff : "Porky Pig 200

15  pound slob in a double wide. Figure. I got some picture messages of you today.  Oink oink.  Ryan

16  must like mountain climbing."  Received 5:57 pm, Sender 5000;

17       27) On January 22, 2008, Plaintiff called Anderson and told him to stop calling.  In response,

18  Anderson stated, "I don't have to stop it's my job";

19       28) On or about January 22, 2008, Plaintiff called CNAC and spoke to Rose who stated that

20  CNAC hired Anderson and that she will get Anderson to cease and desist.

21       As a result of the above, Plaintiff alleges she was forced to provide personal information to

22  her employer and friends so they would not reveal private information, as well as to ensure the

23  safety of those involved.  Declaration of Jessica Hartung dated March 24, 2009 at pg. 5. (Doc. 74).

24  Plaintiff subsequently voluntarily surrendered the car.  Id. In addition, Plaintiff contends that she

25  suffered tenseness, headaches, nervousness, fear, worry, unhappiness, loss of sleep, nightmares,

26  crying jags, loss of appetite, loss of concentration, loss of enjoyment of life, shortness of breath,

27  humiliation, and extreme emotional distress. Id.  Moreover, Plaintiff alleges that Defendant's actions

28

5

1   aggravated her anxiety disorder, post-traumatic stress disorder, back injury, and asthma which

2   forced her to obtain medication from her psychiatrist. Id.

3        Defendant was served with a copy of the complaint on April 9, 2008.  (Doc. 8).  Defendant

4   failed to respond to the complaint or otherwise appear in this action.  On September 30, 2008,

5   Plaintiff requested entry of default against Defendant.  (Doc 49). The Clerk of the Court entered

6   Defendant's default on October 1, 2008. (Doc. 50).  On November 14, 2008, Plaintiff filed a Motion

7   for Default Judgment against John Anderson, aka, John Edens.  (Doc. 58).  The matter was set for a

8   damages hearing, however, the Court became aware that Defendant may not have been properly

9   served with the complaint and issued an order on January 14, 2009, informing Plaintiff of the

10  difficulties with the proof of service.  (Doc. 65).  On January 21, 2009, Defendant subsequently

11  moved to withdraw the Motion for Default. (Doc. 66).   The court granted Plaintiff's Motion to

12  Withdraw the Motion for Default Judgment and vacated the default issued on October 1, 2008.

13  (Doc. 68).

14       Plaintiff subsequently served Defendant with the summons, complaint, and statement of

15  damages on January 29, 2009.  (Doc. 69).  The Defendant failed to appear in this action again and

16  default was entered by the Clerk of the Court against him on March 16, 2009.  (Doc. 71).   Plaintiff

17  filed the instant Amended Motion for Default Judgment on March 23, 2009.  (Doc. 72).  Defendant

18  John Anderson is named in the first, second, and fifth causes of action of the complaint for violations

19  of the of the FDCPA, the Rosenthal Act, and for Invasion of Privacy, respectively.  Based on these

20  violations, Plaintiff seeks a total award of $58,929.00.  More specifically, Plaintiff seeks the

21  following relief:

22       1.      $50,000.00 in emotional damages;

23       2.      $2,000.00 in statutory damages;

24       3.      Attorneys' fees in the amount of $6,579.00; and

25       5.      Costs in the amount of $350.

26                                **DISCUSSION**

27  Plaintiff  moves for entry of default judgment pursuant to Federal Rule of Civil Procedure

28                                      6

55(b)(2), which provides that judgment may be entered:

> (2)    By the Court.  In all other cases, the party must apply to the court for default judgment.  A default judgment may be entered against an infant or incompetent person only if represented by a general guardian, committee, conservator, or other like fiduciary who has appeared. If the party against whom default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 3 days before the hearing.  The court may conduct hearings or make referrals - preserving any federal statutory right to a jury trial - when, to enter or effectuate judgment, it needs to : (A) conduct an account; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.

Upon default, the well-pleaded allegations of the complaint relating to liability are taken as true.  Dundee Cement Co. v. Highway Pipe & Concrete Products, Inc. 722 F.2d 1319, 1323 (7th Cir.  1983); TeleVideo Systems, Inc. v. Heidenthal, 826 F.2d 915, 917-918 (9th Cir. 1987).  Thus, "[a]t the time of entry of default, the facts alleged by the plaintiff in the complaint are deemed admitted."  10 J. Moore, Moore's Federal Practice §55.11 (3d ed. 2000).  While the allegations related to liability are true, the amount of damages suffered are ordinary not. Dundee Cement Co. v. Highway Pipe & Concrete Products, Inc. 722 F.2d at 1323.  However, a judgment by default may be entered without a hearing on damages if the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits. Id.  In this case, Plaintiff is seeking a considerable amount in emotional distress damages which is not capable of being ascertained from the declaration submitted.  Accordingly, the Court held a damages hearing on May 15, 2009.

A.    Plaintiff is Entitled to Entry of Default Judgment

Factors which may be considered by courts in exercising discretion regarding the entry of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.  Eitel v. McCool, 782 F.2d 1470, 1471-1472 (9th Cir. 1986).

The Court has evaluated the factors listed above and finds that the facts in this case weigh

1  heavily in favor of granting default judgment.  First, Plaintiff would suffer prejudice if the court does

2  not enter default judgment because she would have no other means of recovery.  Second, as outlined

3  below, Plaintiff's complaint properly alleges the necessary elements of each cause of action which

4  satisfies the second and third factors; the merits of the substantive claim, and the sufficiency of the

5  complaint.  The fourth factor is also met since there is a significant amount of money at stake in this

6  action in the form of actual damages, which as discussed below, are authorized under law.

7         The fifth factor, the possibility of a dispute concerning the material facts is also met.

8  Defendant never appeared in this action.  Therefore, Defendant is not in a position to defend the

9  action, or to dispute material facts.  Given Defendant's non-appearance, the sixth factor is also

10  satisfied since there is also no evidence that default resulted from excusable neglect.  With regard to

11  the last factor, although cases should be decided on the merits when reasonably possible, such

12  preference alone is not dispositive.  PepsiCo Inc., v. California Security Cans, 238 F. Supp. 2d 1172,

13  1177 (C.D. Cal. 2002).  Defendant's failure to respond and defend this action, renders a decision on

14  the merits impractical.  Finally, Defendant does not appear to be an infant or incompetent person,

15  and is not in the military service or otherwise exempted under the War and National Defense

16  Servicemember's Civil Relief Act.

17  B.      Sufficiency of the Complaint and Damages

18         **1. The FDCPA**

19         The FDCPA was enacted in response to inadequate laws to redress injuries to consumers

20  from abusive, deceptive, and unfair debt collection practices by debt collectors.  15 U.S.C. § 1692.

21  The FDCPA broadly prohibits: (1) unfair or unconscionable collection methods, (2) conduct which

22  harasses, oppresses, or abuses any debtor, and (3) any false, deceptive, or misleading statements in

23  connection with the collection of a debt. 15 U.S.C. § 1692d-f.  To bring a valid FDCPA action, the

24  defendant must be a "debt collector" and the plaintiff must be a "consumer" within meaning of

25  FDCPA. 15 U.S.C.A. § 1692a.  The FDCPA creates a private right of action against a debt collector.

26  15 U.S.C. § 1692k.

27         Anderson is a debt collector and Hartung is a consumer under the FDCPA.  Beginning on

28                                                    8

January 16, 2008, Defendant unlawfully obtained Plaintiff's contact information from a third party. Thereafter, he sent a series of harassing messages and used continuous abusive tactics to collect a debt including misrepresenting that he was an attorney, threatening to contact Plaintiff's employer, and making a phone call to Plaintiff's employer. Furthermore, Defendant Anderson told Plaintiff that he would have her arrested if she did not pay the debt or return the car, called her names, told Plaintiff he had taken pictures of her, and made inappropriate sexual comments.

Based on the allegations in complaint, Anderson's actions violate the following sections of the FDCPA: 15 U.S.C. § 1692c (b) (prohibits the improper use of third party contacts); 15 U.S.C. § 1692d (prohibits harassment or abuse); 15 U.S.C. § 1962d (2) (prohibits profane language and/or other abusive language); 15 U.S.C. § 1692d (5) (prohibits repeated telephone calls); 15 U.S.C. § 1692e (prohibits false representations); 15 U.S.C. § 1692e (2)(A) (prohibits false impression of legal status of debt); 15 U.S.C. § 1692e (3) (prohibits false impression that an individual is an attorney); 15 U.S.C. § 1692e (4) (prohibits false impression that nonpayment will result in arrest); 15 U.S.C. § 1692e (5) (prohibits threat to take action that cannot be legally taken); 15 U.S.C. § 1692e (7) (prohibits giving a consumer the impression that they have committed a crime) 15 U.S.C. § 1692e (10) (generally prohibits false representations and deceptive means); 15 U.S.C. § 1692f (prohibits unfair and unconscionable means to collect a debt); and 15 U.S.C. § 1692f (6) (prohibits threats to unlawfully disable Plaintiff's property).

### a. Actual Damages based on the FDCPA

Plaintiff requests actual damages in the amount of $50,000. Under the FDPCA actual damages may be awarded to a Plaintiff as a result of a defendant's failure to comply with the Act. 15 U.S.C. § 1692k(a)(1). However how to interpret the "actual damage" language with respect to emotional distress is a controversial issue that has not yet been addressed by the Ninth Circuit. Bolton v. Pentagroup Financial Services, LLC., 2009 WL 734038 at *10-11 (E.D. Cal., Mar 17, 2009); Costa v. National Action Financial Services, 2007 WL 4526510 at *7-8 (E.D. Cal., December 19, 2007). District courts nationally have issued conflicting decisions regarding this issue. Some courts have determined that under the FDPCA a Plaintiff is not required to meet the state law

9

standards for intentional infliction on emotional distress ("IIED").  Costa v. National Action Financial Services, 2007 WL 4526510 at *7-8.   Courts that do not require state law requirements have analogized the FDCPA to the Fair Credit Reporting Act. ("FCRA").  Id.  citing, Panahiasal v. Gurney, 2007 WL 738642 at *2 (N.D. Cal. March 8, 2007); Donahue v. NFS, Inc., 781 F. Supp. 188 (W.D.N.Y. 1991)("A plaintiff's right to recovery of actual damages under the FDCPA predicated on claimed emotional distress remains independent of the plaintiff's right, if any, to recover for emotional distress under state law"); see also Clodfelter v. United Processing, Inc., 2008 WL 4225557 (C.D. Ill. Sept. 12, 2008).

Alternatively, other courts, including two in this district, require a plaintiff to prove a claim for IIED under state law in order to collect damages for emotional distress.  Bolton v. Pentagroup Financial Services, LLC., 2009 WL 734038 at *10-11  (Plaintiff's transitory stress failed to meet state IIED standard); Costa v. National Action Financial Services, 2007 WL 4526510 at *7-8 (same); See also Pflueger v. Auto Finance Group, Inc., 1999 WL 33738434 at *4 (C.D. Cal., 1999); cf. Carrigan v. Central Adjustment Bureau, Inc., 502 F. Supp. 468, 470-471 (N.D. Ga. 1980) (holding Plaintiff's FDCPA's claim for intentional infliction of mental distress met state requirements under Florida tort law); Venes v. Professional Service Bureau, Inc., 353 N.W. 2d 671, 674-675 (Minn. Ct. App. 1984) (finding Plaintiff satisfied state elements of IIED and could thus recover emotional distress damages).

Consistent with the decisions issued in this district and the approach adopted by Chief Judge Ishii, the Court will apply the California IIED standard.  See, Bolton v. Pentagroup Financial Services, LLC., 2009 WL 734038 at *10-11.  Under California law, to prove a claim for IIED, a plaintiff must show: (1) extreme and outrageous conduct by the defendant; (2) extreme or severe emotional distress to the plaintiff; and (3) actual and proximate causation between the two.  Spinks v. Equity Residential Briarwood Apartments, 171 Cal.App.4th 1004, 1045, Cal. App 6 Dist. (2009) citing  Firestone Tire & Rubber Co., 6 Cal.4th 965, 1001, 25 Cal. Rptr. 2d 550 (1993). To be outrageous, the defendant's conduct must be either intentional or reckless, and it must be so extreme as to exceed all bounds of decency in a civilized community. Id.  "Behavior may be considered

outrageous if a defendant : (1) abuses a relation or position which gives him power to damage the plaintiff's interest; 2) know the plaintiff is susceptible to injuries through mental distress, or 3) acts intentionally or unreasonably with the recognition that the actions are likely to result in illness through mental distress." Kisesskey v. Carpenters' Trust for So. California, 144 Cal. App. 3d 222, 230, 192 Cal Rptr. 492 Cal. App. 2 Dist. (1983).  Courts have long recognized in collection cases that the very nature of collection efforts often cause a debtor to suffer emotional distress. Bundren v. Superior Court, 145 Cal. App. 3d 784, 193 Cal. Rptr 671 (1983); Bowden v. Spiegel, 96 Cal. App. 2d 793, 789 (1950).  To be actionable as an IIED claim, the conduct must go beyond "all reasonable bounds of decency." Bundren v. Superior Court, 145 Cal. App. 3d at 789.

When considering whether a Plaintiff has suffered severe emotional distress, courts have noted that "complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people.   The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.  The intensity and duration of the distress are factors to be considered in determining its severity.  It appears therefore, that in this context, severe emotional distress means, emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." Fletcher v. Western National Life Ins. Co., 10 Cal.App.3d 376, 397, 89 Cal.Rptr. 78, Cal.App.4th Dist. (1970).  Such injury may include all highly mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea. Golden v. Dungan 20 Cal. App.3d 295, 311, 97 Cal. Rptr. 577 (1971); Fletcher v. Western Life Ins., Co., 10 Cal. App. 3d at 397.

There is no requirement under California law that a Plaintiff provide corroborating evidence in order to establish a claim for emotional distress. [2]  However, a damages award cannot be based

---

[2]  In other circuits involving violations of the FDCPA, when courts have not required a Plaintiff to meet the more stringent state IIED requirements, a plaintiff alleging intangible loss must set forth evidence with specificity including corroborating testimony or medical or psychological evidence in support of the damage award. Cousins v. Trans Union Co., 246 F. 3d 359, 371 (5th Cir. 2001). Unsupported self-serving testimony by a plaintiff is not sufficient. Wantz v. Experian Info. Systems, 386 F. 3d 829, 834 (7th Cir. 2004), abrogated on other grounds in Safeco Ins. Co. of America v. Burr, 551 U.S. 47

solely on conjecture or speculation. There must be competent proof of emotional distress suffered by the Plaintiff. Austero v. Washington National Ins. Co. 132 Cal.App.3d 408, 417, 182 Cal.Rptr. 919, (1982) disapproved on another ground in Brandt v. Superior Court, 37 Cal.3d 813, 816-817, 210 Cal.Rptr. 211, 693 P.2d 796. (1985). Testimony of the plaintiff alone will suffice. Tan Jay International, Ltd. v. Canadian Indemnity Co. 198 Cal.App.3d 695, 708, 243 Cal.Rptr. 907 (1988); see also, Young v. Bank of America National Trust & Savings Assoc., 141 Cal. App. 3d 108, 190 Cal. Rptr., 122 (1983) (Plaintiff's testimony that she experienced embarrassment, shame, helplessness, nervousness, headaches, insomnia, and frustration because of bank's failure to adjust her credit card was sufficient evidence warranting jury instruction on emotional distress damages).[3]

   b.    *Summary Plaintiff's Testimony*

   At the hearing on May 15, 2009, Plaintiff testified that she had been diagnosed with post-traumatic stress disorder and generalized anxiety disorder following her service in the United States Air Force in April 2005. At the time of the incident alleged in the complaint, she was under a psychiatrist's care for the above conditions and also had history of migraine headaches. Prior to this incident, she would suffer panic attacks in which she experienced bouts of extreme panic, crying and anxiety induced asthma attacks which resulted in difficulty breathing. She had been prescribed Prozac, Valium and Albuterol to control these conditions at the time she was contacted by Defendant John Anderson. Additionally, she was prescribed Pergaset to treat her migraine headaches. While she was taking the Prozac daily, the Valium, Albuterol, and Pergaset, was only prescribed on an as

(2007).

---

[3] While the Ninth Circuit has not specifically ruled on whether corroborating testimony or other evidence is necessary to establish emotional distress damages pursuant to FDCPA, the court has held that emotional distress damages generally may be proven in a number of ways, including through corroborating medical evidence or non-expert testimony establishing "manifestations of mental anguish [and the occurrence of] significant emotional harm. Dawson v. Wash. Mut. Bank., F.A. 390 F. 3d 1139, 1149-50 (9th Cir. 2004) (finding that damages for emotional distress are available under bankruptcy law when a creditor violates the automatic stay that follows from the filing of a bankruptcy petition.). Emotional distress damages can also be readily apparent without corroborative evidence where a plaintiff was a victim of egregious conduct or where the "circumstances make it obvious that a reasonable person would suffer significant emotional harm. Id. at 1150; See also, Zhang v. American Gem Seafoods, 339 F. 3d 1020, 1040 (9th Cir. 2003) (upholding emotional distress damages based only on testimony.); Fausto v. Credigy Services Corp., et al., 598 F. Supp. 1049 (N.D. Cal., Feb. 17, 2009).

needed basis which she had not used regularly prior to this incident.

After Defendant contacted Plaintiff, Plaintiff began experiencing severe panic attacks which resulted in uncontrollable crying throughout the day, insomnia, headaches, lack of energy, a loss of appetite and difficulty breathing.  She needed to take Valium tablets twice a day to calm her down, as well as use her Albuterol inhaler more frequently.  She also increased her use of Pergaset to manage her migraine headaches, as well as over the counter medications to help her sleep.

Over the course of the five day period, Plaintiff contacted her psychiatrist because she was afraid she would run out of the Valium. She made an appointment to see her psychiatrist as a result of Defendant's contact.  Plaintiff was particularly troubled when she learned that an unauthorized user had been added to her T-Mobile account and contacted the police to report a false identity claim.  Moreover, the fact that Defendant was sending her messages about close friends and knew specific personal information about them caused her considerable stress.  Finally, Plaintiff was very scared when she received a text message from Defendant indicating that he had taken pictures of her late one evening. This was particularly disturbing because she lives in a rural area, she was home alone, and did not know whether Defendant was outside her house.

Prior to the contact with Defendant, Plaintiff believed that her condition was getting better.  However, when she received the text messages from Defendant she "snapped" and did not know what to do.  On a scale of 1 to 10 Plaintiff reported that her stress level was the highest it could be.  She believes that this incident set her treatment back and resulted in an aggravation of her pre-existing condition.  The aggravated symptoms lasted for approximately eight to nine months after Plaintiff surrendered the car.  Plaintiff has only recently returned to her level of functioning prior to this incident.

c.    *Amount of Actual Damages Under the FDCPA*

Based on Plaintiff's testimony, the Court finds that she has met the state requirements of an IIED claim as Defendant's conduct goes beyond all reasonable bounds of decency.  Defendant engaged in extreme and outrageous conduct including abusing his position of authority as a debt collector to harass, lie and intimidate Plaintiff.  He contacting her repeatedly, took pictures of her,

13

obtained personal information about her and her friends, and fraudulently added himself to Plaintiff's T-Mobile account.  It is clear that given the nature and the duration of distress experienced by Plaintiff that she suffered severe emotional distress as a result of Defendant's actions.   The severity of her distress is evidenced by her need to take additional prescribed and over the counter medications, as well as the need to consult her psychiatrist about the incident.  She experienced panic attacks which exacerbated her asthma, suffered from increased migraine headaches, had difficulty sleeping, and would cry uncontrollably.  This incident set Plaintiff's treatment for post-traumatic stress and anxiety disorders back and it has taken Plaintiff several months to return to her prior level of functioning.  The distress Plaintiff experienced exceeds that which any reasonable person in a civilized society should endure.

The remaining issue is the amount of actual damages that should awarded in this case. Plaintiff has not provided the Court with any state IIED cases defining an appropriate damages award.[4]  Plaintiff has, however, cited Panahiasal v. Gurney, 2007 WL 738642 in support of her request for $50,000 in actual damages.  Panahiasal v. Gurney was a case involving two plaintiffs based on violations of the FDCPA.  One plaintiff was awarded $50,000 in emotional damages based on abusive debt collection practices which included repeated telephone abuse resulting in embarrassment, fear, anger, panic, humiliation, nervousness, crying fits, difficulty eating and sleeping, and diarrhea.  Panahiasal v. Gurney, 2007 WL 738642 at *2.  However, the other plaintiff in Panahiasal v. Gurney was only awarded $10,000 after suffering from embarrassment, humiliation, harassment, anger, anxiety, lack of concentration, and stress. Id. Plaintiff has also cited Clodfelter v. United Processing, Inc., 2008 WL 4225557 (C.D. Ill. Sept. 12, 2008) in which a motion for default judgment against a debt collector was granted awarding $351,000 in damages including $100,000 in actual damages.  This case involved a debt collection company with a long history of using abusive tactics that called Plaintiff, his family members, and Plaintiff's employer, as well as threatening criminal prosecution for failure to pay a $400 debt.

---

[4] The Court was unable to locate any California cases identifying the amounts of emotional distress damages awarded in IIED cases involving debt collection actions.

An examination of the cases applying the federal FDPCA standard reveals that the cases cited by Plaintiff are on the high end of the damages award spectrum as most district courts have awarded between $1,000 and $5,000.  See, Baruch v. Healthcare Receivable Management, Inc., 2007 WL 3232090 ( E.D.N.Y. 2007) ($5,000 awarded when consumer received numerous threatening telephone calls and letters and as a result lost sleep, became depressed and suffered heart problems); Cooper v. Ellis Crosby & Assoc., Inc.,  2007 WL 1322380 (D. Conn. 2003) ($3,000 emotional distress damages when debt collector misrepresented he was an investigator from the bank, threatened to call Plaintiff's boss and to subpoena Plaintiff's hard drive on her computer); Gervais v. O'Connell, Harris & Assoc., Inc., 297 F. Supp.2d 435 (D. Conn. 2003) ($1,500 emotional damages awarded when defendant withdrew $2,500 from debtor's bank account and Plaintiff did not seek medical attention but was taking anxiety medication for condition unrelated to Defendant's actions); Chiverton v. Fed. Finance Group Inc., 399 F. Supp. 2d 96 (D. Conn. 2005) (Damages of $5,000 awarded for consumer's emotional distress under the FDCPA for debt collection practices that lasted over a period of several months which included repeated phone calls to consumer's workplace, leading consumer to fear losing his job, as well as directly contacting consumer's supervisor); Teng v. Metropolitan Retail Assoc., 851 F. Supp. 61 (E.D.N.Y. 1994 ) ($1,000 awarded when debt collector who called plaintiff's place of employment several times and obtained the phone number of plaintiff's supervisor, and identified himself as a city marshal threatening to take away plaintiff's furniture).  One jury award of $85,000 in emotional distress damages due to debt collections agency's violation of FDCPA was upheld when violations of the FDCPA had occurred over several months.  Nelson v. Equifax Services, LLC, 522 F. Supp. 2d 1222, 1239 (C.D. Cal. 2007).

Here, Defendant's actions were egregious. The Court is also mindful that Plaintiff had existing emotional conditions that were exacerbated by Defendant's conduct resulting in her need to see a psychiatrist and obtain medication.  However, even after considering all of these factors, Plaintiff's request for $50,000 appears to be excessive given that Plaintiff was exposed to Defendant's actions for a limited period of time. The Court has considered Plaintiff's declaration

15

1   and testimony, as well as the awards given in similar cases.  Accordingly, the Court recommends

2   that Plaintiff be awarded $25,000 in actual damages.

3                   d.      *Amount of Statutory Damages Under the FDCPA*

4           Under the FDCPA, plaintiffs are entitled to statutory damages up to $1,000 pursuant to 15

5   U.S.C. § 1692(a)(2)(A).  A court shall consider among other factors, "the frequency and persistence

6   of the noncompliance, and the extent to which the noncompliance was not intentional." 15 U.S. C. §

7   1692k(b)(1).  The Court has concluded that based on the unanswered allegations in the complaint

8   and the nature of the allegations, Defendant's actions were intentional.   Plaintiff is entitled to

9   $1,000 in statutory damages under this provision.

10          **2. The Rosenthal Act**

11          The Rosenthal Act requires an intent that is knowing and willing. Based on the unanswered

12  allegations in the complaint and the nature of the allegations,  Defendant's actions were intentional.

13  Moreover, California Civil Code § 1788.17 states that every violation of the FDCPA is ipso facto

14  violation of the Rosenthal Act.  Pursuant to Cal. Civ. Code § 1788.30(b), Plaintiff is entitled to

15  $1,000 statutory damage award based on this violation.

16          **3. Invasion of Privacy**

17          In order to recover for the tort of invasion of privacy (intrusion upon seclusion), Plaintiff

18  must prove the following elements : (1) an intentional intrusion (physical or otherwise); 2) on the

19  solitude or seclusion of another; (3) that would be highly offensive to a reasonable person.

20  Panahiasal v. Gurney, 2007 WL 738642 at *2 citing Kuhn v. Account Control Technology, 865 F.

21  Supp. 1443 (D. Nev. 1994).   Moreover, "improper conduct in knowingly and intentionally pursuing

22  a person to force payment of a debt, whether or not he owes it, may under some circumstances, give

23  rise to a right to damages for an invasion of privacy." Panahiasal v. Gurney, 2007 WL 738642 at *2

24  quoting Montgomery Ward v. Larragoite, 467 Pd. 399, 401 (Supreme Court of New Mexico 1970).

25  A number of courts have held that repeated and continuous calls in an attempt to collect a debt give

26  rise to a claim for intrusion upon seclusion. Joseph v. J.J. Mac Intyre Companies, 281 F. Supp. 2d

27  1156, 1169 (N.D. Ca. 2002), citing, Shulman v. Group W. Prod. Inc., 18 Cal. 4th 200 (1998); See

28                                                   16

1    also,  Lowe v. Surpas Resource Corp. et al., 253 F. Supp. 2d 1209 (D. Kan. 2003).

2          Plaintiff has not requested an award for any damages for this cause of action.  Furthermore,

3    while Defendant's abusive conduct meets all elements of this tort, Plaintiff has already been

4    awarded damages for emotional distress under the FDCPA. The Court will not recommend

5    additional damages be awarded based on this cause of action.

6          **4. Attorney's Fees**

7          The FDCPA and the Rosenthal Act specifically authorize an award of attorney's fees to a

8    prevailing plaintiff.  15 U.S.C. § 1692k(a)(3) & Cal. Civil Code. § 1788.30 (c).  The Court

9    determines an attorney fee award by calculating the "lodestar figure" which entails taking the

10   numbers of hours reasonably expended on the litigation and multiplying it by a reasonable hourly

11   rate.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Ferland v. Conrad Credit Corp., 244 F. 3d

12   1145 (9th Cir. 2001) (In a FDCPA case, district court must calculate awards for attorney's fees using

13   "lodestar" method").  However, the court may enhance or reduce the lodstar figure.  Fischer v. SJB-

14   P.D., Inc., 214 F. 3d 1115 (9th Cir. 2004).  Additionally, "[a] court is justified in relying on a

15   requesting counsel's recently awarded fees when setting that counsel's reasonable hourly rate."

16   Lowe v. Elite Recovery Solutions, 2008 WL 324777 at *5 (E.D. Cal. Feb. 5, 2008) quoting Abad v.

17   Williams, Cohen & Gray, Inc., 2007 WL 1839914 at *4 (N.D. Cal. 2007).

18         In the first Motion for Default Judgment, counsel requested $12,240.00 in attorney's fees

19   which included fees for work done on this case related to other defendants.  Plaintiff was ordered to

20   file a brief justifying this amount.  Plaintiff's counsel has requested $6,579.00 in the current motion

21   and requests fees which apply only to this defendant.  He has indicated that hourly billing rate is

22   $295 an hour.  However, two courts, including one in this district, reduced this counsel's billing rate

23   to $250 an hour.  Lowe v. Elite Recovery Solutions, 2008 WL 324777 at *5 (E.D. Cal. Feb. 5,

24   2008); Scheuneman v. 1st Credit of America, 2007 WL 1969708 (N.D. Cal. 2007).  Counsel's rate

25   was also reduced to $275 an hour in Civitello v. 1st Credit of America, Northern District of

26   California, Case No. CO5-04944.

27         The Court finds that $250.00 per hour is a reasonable billing rate in this case.  A review of

28                                                    17

1   the documents submitted by counsel in support of his request for attorney's fees indicates that he has

2   spent hours 22.1 hours on this case which totals $5,525.00 when the $250 per hour rate is applied.

3   There was also an additional 3.8 hours billed for legal services provided at a rate of $115.00 per hour

4   amounting to $437.00.  The Court will also recommend that this request be granted.  Accordingly,

5   the Court will recommend that Plaintiff's counsel be awarded at total of  $5,962.00 in attorney's

6   fees.  The request for $350.00 for other costs is also reasonable.

7                                              **RECOMMENDATION**

8           For the reasons discussed above, the Court RECOMMENDS that Plaintiff's Amended

9   Motion for Default Judgment in favor of Plaintiff and against Defendant John Anderson, aka John

10  Edens, be GRANTED IN PART and DENIED IN PART for a total award amount of $ 33,312.00 to

11  be broken down as follows ;

12          2.       Plaintiff be AWARDED actual damages in the amount of $25,000;

13          3.       Plaintiff be awarded a total of $2,000.00 in statutory damages including $1,000 under

14                   the Rosenthal Act and $1,000 under the FDCPA respectively;

15          4.       Attorneys' fees be awarded in the amount of $5,962.00; and

16          5.       Costs in the amount of $350.

17          These findings and recommendations are submitted to the district judge assigned to this

18  action, pursuant to 28 U.S.C. § 636(b)(1)(B).  Within fifteen (15) court days of service of this

19  recommendation, any party may file written objections to these findings and recommendation with

20  the Court and serve a copy on all parties.  Such a document should be captioned "Objections to

21  Magistrate Judge's Findings and Recommendation."  The district judge will review the magistrate

22  judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are

23  advised that failure to file objections within the specified time may waive the right to appeal the

24  district judge's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

25          IT IS SO ORDERED.

26      **Dated:    June 26, 2009            /s/ Gary S. Austin**
                                      UNITED STATES MAGISTRATE JUDGE

27

28                                               18